STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. ARTHUR J. GAYNOR, JAMES J. BELL AND FRANK FOY, PLAINTIFFS IN ERROR.

Submitted October 29, 1937—Decided January 26, 1938.

For the plaintiffs in error, *John W. Ockford.*

For the defendant in error, *Arthur C. Dunn,* prosecutor of the Pleas.

The opinion of the court was delivered by

HEHER, J.   Public policy ordains that a combination designed to wage war upon society shall be dispersed and its members rendered incapable of harm.   This is the objective of section 4 of chapter 155 of the laws of 1934 (*Pamph. L., p.* 394), popularly termed the "Gangster Act;" and it is therefore a valid exercise of the legislative power.

The state is invested, in virtue of its police power—an attribute of sovereignty—with a large measure of discretion in the creation and definition of criminal offenses.   The power is, of course, subject to constitutional restraints; and its exercise must needs be reasonable and not arbitrary or capricious.   At common law, an indictable offense consisted of a wrong which, in the general public interest, should be prosecuted and punished by the state.   Such legislative acts must, in the main, have reasonable relation to one of the

needs which give rise to the exercise of the police power. And the constitutional requirements of "due process" and "equal protection of the laws" would be otherwise met if the statute creating and defining the offense lay down a definite, ascertainable standard of guilt, require an accusation in due form, and operate without discrimination on all persons and classes of persons similarly situated. *Levine* v. *State,* 110 *N. J. L.* 467.

The touchstone is whether the text of the statute is "adequate to inform persons accused of violation thereof of the nature and cause of the accusation against them." *United States* v. *Cohen Grocery Co.,* 255 *U. S.* 81; 65 *L. Ed.* 516, 517. See, also, *Connally* v. *General Construction Co.,* 269 *U. S.* 385; 70 *L. Ed.* 322; *Nash* v. *United States,* 229 *U. S.* 373; 57 *L. Ed.* 1232. "Laws which create crime ought to be so explicit that all men subject to their penalties may know what acts it is their duty to avoid. *United States* v. *Sharp, Pet. C. C.* 118. Before a man can be punished, his case must be plainly and unmistakably within the statute." *United States* v. *Brewer,* 139 *U. S.* 278; 35 *L. Ed.* 190.

The prohibitory language of section 4 of the act under review cannot fairly be categorized as "vague, indefinite, and uncertain." The evident aim of this provision was to render penal the association of criminals for the pursuit of criminal enterprises; that is the gist of the legislative expression. It cannot be gainsaid that such was within the competency of the legislature; the mere statement of the purpose carries justification of the act. The police power comprehends reasonable preventive measures no less than the punishment of perpetrated offenses. If society cannot impose such taint of illegality upon the confederation of convicted criminals, who have no lawful occupation, under circumstances denoting, as is plainly the case here, the pursuit of criminal objectives, it is helpless against one of the most menacing forms of evil activity—incapable of vindicating its inherent authority to effect individual security by repelling the common enemy.

The facts of the case in hand serve to point the need and the justification of this measure. These plaintiffs in error and

their associates were indubitably engaged in criminal activities. They possessed in their secluded rendezvous a varied assortment of lethal weapons (many of them stolen) and a plentiful supply of ammunition in its various forms. The variety of the weapons—nearly all loaded—bear testimony to the vicious character and scope of the enterprise. There were revolvers, rifles, a shot gun, a gas riot gun, a gas container and projectiles, a pocket grenade, a gas cartridge, an electric blast cap and a bottle of tear gas crystals. The seven occupants of the bungalow were residents of the city of New York. Yet one of the revolvers had been filched from a deputy sheriff of Cumberland county, in this state. The gas kit, shells and gas bombs had been purloined from a manufacturer of police equipment. There were stolen automobile registration plates, issued by the States of New York and New Jersey. They had taken possession of the bungalow but a short time before their arrest under circumstances bespeaking a criminal purpose. Each plaintiff in error had been convicted of crime—Gaynor, of possessing a pistol; Foy, of the separate offenses of robbery and larceny; Bell, of possessing a firearm; and one of their associates, Maiwald, had been thrice convicted. They were unable to give a rational account of their possession of the firearms and ammunition—one consistent with lawful purposes. Plainly, they were not then "engaged in any lawful occupation." Loaded guns were so placed as to indicate a purpose to resort to armed resistence if their liberty were threatened. Death would be the portion of one so interfering. This, it is fairly inferable, was averted in this instance only because the occupants of this veritable arsenal were in sound sleep when the hand of the law reached out for them. And these weapons were to be of service in the perpetration of crimes plotted by the conspirators. They were "gangsters" in the modern colloquial sense of the term—of a class whose anti-social activities have given rise to grave problems calling for unwonted corrective measures. A system of jurisprudence that fails to brand as criminals men so circumstanced is radically deficient.

It is said that the term "gang" does not of necessity connote a criminal or unlawful purpose, and this provision is therefore an excess of legislative power. Such, however, is a modern concept of the term; and, in the construction of the provision, the word is to be given a meaning consistent with the general object of the statute. In its original sense it signifies action—"to go;" in its modern usage, without qualification, it denotes—in common intent and understanding—criminal action. It is defined as "a company of persons acting together for some purpose, usually criminal," while the term "gangster" is defined as "a member of a gang of roughs, hireling criminals, thieves, or the like." *Webster's New International Dictionary* (*2d. ed.*). And the Oxford English Dictionary likewise defines the word "gang" as "any company of persons who go about together or act in concert [in modern use mainly for criminal purposes]." Such is plainly the legislative sense of the term.

There is also invoked the doctrine laid down in *People* v. *Belcastro,* 356 *Ill.* 144; 190 *N. E. Rep.* 301; 92 *A. L. R.* 1223, that "with mere guilty intention, divorced from an overt act or outward manifestation thereof, the law does not concern itself." True, criminality is not ordinarily predicated upon evil intent not acted upon. At common law, "imagining the death of the king" was not subject to judicial cognizance as punishable treason unless "demonstrated by some open, or *overt* act." 4 *Bl. Com.* 6, 78, 79. This definition, it is to be noted, does not require that the overt act be directed to the consummation of the specific unlawful object of the evil intent. But however this may be, the power of the state to take reasonable, adequate measures to eradicate a public evil is not to be denied. The primary function of government—indeed it is an obligation fundamental in the social compact—is to render security to its subjects. And any mischief menacing that security demands a remedy commensurate with the evil. Modern crime is highly organized. Evil intentions are implemented with the new inventions. To more effectively outwit the officers of the law combination has been resorted to. And the present day gangster has no

regard for life in the violent quest for the property of others. It is readily conceivable that lives—not to mention property—were saved by the apprehension of these particular desperadoes.

The principle exemplified in the case of *Levine* v. *State, supra,* and the vagrancy statutes presupposes a criminal status, not due to the perpetration of a specific offense, presently or in the past, but rather by reason of an intent, sufficiently manifested by overt acts, to commit offenses *in futuro* inimical to the general public interest. As this court said in the last cited case: "It is the undoubted function of the state to apprehend those who would violate laws ordained to protect the person and property of citizens, and who are seeking the opportunity to do so," for the reason that "they are potential actors in crimes of the first magnitude." Thus a "common burglar"—one who by practice and habit is a burglar—has a status which subjects him to punishment in the exercise of an authority essentially preventive. Vagrancy was a punishable offense at common law; and statutes subjecting persons having that status to punishment are everywhere recognized as a legitimate exercise of the legislative function. These statutes are generally sustained as in the nature of a police regulation to prevent crime, rather than the punishment of a specific overt act branded as criminal. 66 *C. J.* 399. The annals of crime are replete with instances demonstrating the wisdom of such enactments as a means of apprehending persons bent on crime. As regards the public need of preventive action, there is no substantial difference between a general and a specific intent to perpetrate crimes of violence.

The offense denounced by the statutory provision under review is in essence a conspiracy. The fundamental difference between this enactment and the general provision relating to conspiracy embodied in the Crimes act (*Comp. Stat.* 1910, *p.* 1757) consists in this: To constitute a conspiracy under the latter, there must be an agreement to commit a specific crime or other enumerated unlawful act, while under the former, a combination organized to engage generally in

criminal activity, *i. e.,* to plan and perpetrate crime, is condemned.

An overt act was not at common law an essential ingredient of a punishable criminal conspiracy. The effecting of the unlawful combination sufficed. Nor is an overt act requisite to render punishable all the conspiracies denounced by section 37 of the Crimes act, *supra.* From early times the law has recognized the danger of combinations having an unlawful object. The conspiracy itself has been regarded as "a thing amiss." While evil intent in an individual, unaccompanied by some overt act, has not been generally regarded as the proper subject of punitive action by the state, a conspiracy to do the same thing is viewed as holding sufficient danger to render it punishable as a crime, even though there has been no overt act in furtherance of the unlawful object. See *Louis Kamm, Inc.,* v. *Flink,* 113 *N. J. L.* 582.

We have no occasion to consider the question of the power of the legislature to so classify a combination whose members, while not moved by evil intent, may yet, because of demonstrated anti-social tendencies and the special circumstances, be exposed, through the medium of the combine, to both the temptation and the means to perpetrate crime—in other words, to obviate the occasion of evil for those who, through sheer depravity or moral instability, are unwilling or unable to reject the allurements of crime.

It goes without saying that, in the application of such statutes, there must be a scrupulous adherence to all principles designed to safeguard the liberty of the accused against arbitrary invasion. Pure surmise is not to be made a substitute for evidence. The statute is to be strictly construed; and the statutory status must be proved beyond reasonable doubt, however difficult that may be in the individual case.

Thus it is that this statutory provision does not predicate criminality upon bad repute alone or mere evil intent in an individual, not aggravated by association with others for a like common purpose. Nor is there lacking a certain, definite and immutable standard of conduct, the non-observance of which fixes guilt. It therefore satisfies the test of the Four-

teenth Amendment of the Federal Constitution and the due process requirements of our State Constitution, article I, paragraph 1. Nothing is left, in the branding of the conduct, to the discretion, arbitrary or otherwise, of the judicial authority.

And, as stated, the proofs brought plaintiffs in error within the condemnation of the statute, for gangsters they were—in the sinister statutory sense. The criminal combination was exhibited by unmistakable overt acts, notably in the assembling under joint control of this wide assortment of deadly weapons. The possession of the stolen motor vehicle registration plates is another persuasive piece of evidence.

The judgment is accordingly affirmed.

*For affirmance*—THE CHANCELLOR, PARKER, CASE, BODINE, HEHER, PERSKIE, HETFIELD, DEAR, WELLS, WOLFS-KEIL, RAFFERTY, WALKER, JJ. 12.

*For reversal*—None.